# Richmond

## ATLANTIC RICHFIELD COMPANY v.
## D. W. BEASLEY.

December 2, 1974.

Record No. 730937.

Present, All the Justices.

*Grover C. Outland, Jr. (Outland & Gray,* on brief), for plaintiff in error.

*A. Andrew Ege, Jr. (Richard G. Brydges; Brydges, Hammers & Hudgins,* on brief), for defendant in error.

Carrico, J., delivered the opinion of the court.

In this landlord-tenant case, the landlord, Atlantic Richfield Company (hereinafter Arco), complains of a judgment for $4,509.93 entered upon a jury verdict in favor of the tenant, D. W. Beasley (hereinafter Beasley). The recovery was based upon a breach by Arco of an implied covenant of quiet enjoyment relating to service station premises leased to Beasley. The sole question on appeal is whether, as a matter of law, Beasley waived the breach and any resulting claim for damages.

The evidence shows that, pursuant to written lease, Beasley for a number of years had occupied premises owned by Arco on Laskin Road in the City of Virginia Beach. The lease provisions

required Beasley to use the premises as an automotive service station and to sell petroleum products and related merchandise. The lease fixed monthly rental, according to a "franchise rent schedule," upon total gallons of motor fuel sold by Beasley during the month.

In late 1971, Arco informed Beasley that it planned to remodel the service station building on the property "without appreciable interference with [his] business." Then, in early 1972, Arco told Beasley it had changed plans and intended to build a new station "behind the old building," demolishing the old upon completion of the new, with "a minimum of interference in [his] operation." Finally, in April, 1972, Arco notified Beasley it had engaged a contractor to demolish the existing building and to replace it with a new structure in the same location.

The building was demolished approximately April 24, 1972. Thereafter, with Arco's consent, Beasley leased a nearby Phillips 66 station for his "service work." Operating from a trailer furnished by Arco, Beasley continued to "pump gas" at the Arco location, but the "majority of the property was closed to traffic" and the volume of his business "decreased appreciably."

Beasley paid rental on the Arco premises for the month of April. On June 15, he agreed to a renewal of the Arco lease. On June 30, he accepted a lease amendment proposed by Arco, changing the "franchise rent schedule" to compute monthly rental upon the total gallons of motor fuel delivered during the month.

Beasley continued operations at the Arco location until July 15, 1972, when he closed the station because he had exhausted his supply of premium gasoline. Two factors contributed to cause this situation: first, at the outset of the new construction, the contractor employed by Arco severed a supply line from a storage tank, then full of "high test" gasoline, and despite Beasley's request, Arco failed to repair the line; second, Beasley was induced to agree to the new "franchise rent schedule" upon Arco's promise to fill his tanks, which would result in a two-cents per gallon "windfall" to Beasley, before an increase in the state gasoline tax became effective July 1; Arco failed to fill the tanks as agreed and, after July 1, refused to deliver gasoline upon Beasley's order because he insisted upon "the load that [Arco] had promised to send in June."

Following Beasley's closing of the station, the contractor on

August 3, at Arco's direction, pumped the "high test" gasoline "out of the disabled tank into the empty tank so that [Beasley] could connect [his] high test pumps again." Beasley reopened the station on August 6. However, the next day, the contractor accidentally severed the electric line to the gas pumps, "so [Beasley] couldn't pump any gas." Later the same day, Beasley received, in the mail, notice from Arco that his lease was cancelled because the premises had been closed for business from August 1 to August 4, a period in excess of 72 hours, allegedly in violation of a lease provision. Beasley then vacated the premises and instituted the present action.

On appeal, there is no dispute concerning the amount of the judgment recovered by Beasley, representing his loss of profits for the period from the date the service station building was demolished to the end of the lease term. Nor is there any dispute that an implied covenant of quiet enjoyment applied to the landlord-tenant relationship or that the demolition of the building constituted a breach of the covenant. Arco contends, however, that the trial court erred in submitting the case to the jury because the evidence showed, as a matter of law, that Beasley had waived the breach and any resulting claim for damages. Beasley contends, of course, that the trial court properly submitted the case to the jury.

To support its claim of waiver, Arco first asserts that when Beasley was notified of the decision to demolish the building, he "never interposed any objection." Thus, Arco says, Beasley "acquiesced" in the decision and thereby waived any right he may have had to rely upon the demolition as a breach of the covenant of quiet enjoyment.

But the record reveals a conflict in the testimony concerning Arco's assertion that Beasley "acquiesced" in the demolition of the service station building. A representative of Arco, testifying at trial, conceded that without Beasley's permission to demolish the building, Arco "couldn't have ... torn it down." The representative insisted, however, that Beasley, when notified of the decision to demolish the building, "never offered any protest." Beasley testified, on the other hand, that he told the representative he "was not agreeable to them demolishing the building, that [he] would prefer that they remodeled the old building, that [he] felt it was adequate."

If Beasley's testimony is accepted, his statement to Arco's

representative was both a protest of the demolition and a denial of his vital consent thereto, sufficient, in either case, to negate Arco's claim of "acquiescence." But, to accept Beasley's testimony is to reject the testimony of Arco's representative, a matter peculiarly within the province of a trier of fact. So, upon this material point alone, a jury question was presented.

■ Even so, Arco contends, there was other evidence showing "without question" that Beasley waived the breach of the covenant of quiet enjoyment. Here, Arco points to evidence that, after the demolition, Beasley remained in possession for more than three months, paid rent for the month of April, renewed the lease, and reaffirmed the lease by agreeing to a new "franchise rent schedule." To avail himself of the breach, Arco argues, Beasley should have vacated the premises within a reasonable time, namely, one month, after the demolition. Failing to do so, Arco concludes, Beasley should be held to have waived the breach.

Arco's contention, however, disregards important aspects of Beasley's claim and overlooks pertinent evidence before the trial court. Beasley does not rely solely upon the demolition of the building as a breach of the implied covenant of quiet enjoyment. Rather, he relies upon "various breaches by Arco of the implied covenant," which, he says, "exhibit a continuing, recurring and cumulative nature." Beasley contends that he was not required to assert Arco's breaches until their "cumulative, continuous or recurring character" had forced him from the premises. And, he concludes, it was a matter for "jury determination" whether, under the circumstances, he acted reasonably in remaining in possession as long as he did.

We agree with Beasley. Arco promised Beasley, as part of its plan to demolish and replace the building, "to keep his station open and pumping gas." Despite this promise, the service station, after the demolition, was virtually "closed to traffic;" the "high test" supply line was severed and never repaired; the electric line to the gas pumps was also severed and, as a result, Beasley "couldn't pump any gas;" the gas tanks were not filled prior to July 1, as Arco had agreed in return for Beasley's acceptance of the new "franchise rent schedule;" and, finally, Arco refused, just prior to Beasley's departure from the premises, to deliver gasoline upon his order.

From this evidence, the conclusion can be drawn that Arco's

promise to keep the "station open and pumping gas" constituted a continuing undertaking by Arco, an extension, in fact, of its covenant of quiet enjoyment. The further conclusion can be drawn that, upon the strength of Arco's promise, Beasley had the right to remain in possession until it became apparent that the promise would not be honored. The additional conclusion can be drawn that Arco repeatedly failed to discharge its undertaking and that, when the cumulative nature of the failures became apparent, Beasley was forced from the premises.

But whether these conclusions should be drawn depends, in large part, upon whether Beasley's testimony or the testimony of Arco's witnesses is accepted. While some of the evidence in the record is undisputed, the remainder is in dispute. More important, Arco and Beasley completely disagree upon what interpretation should be given all the evidence. The resolution of conflicts in testimony, the interpretation evidence should be given, and the conclusions that should be drawn are, as Beasley argues, matters for "jury determination."

For the foregoing reasons, we hold that the trial court did not err in submitting the case to the jury. Accordingly, the judgment appealed from will be affirmed.

*Affirmed.*